**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL NO.  1:06CV18**

| | | |
|---|---|---|
| **TAMMRA G. SHARPE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **Vs.** | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the parties' cross motions for

summary judgment.  For the reasons stated herein, the Plaintiff's motion is

granted and the Defendant's motion is denied.

## I.  STANDARD OF REVIEW

This Court does not conduct a *de novo* review of the decision of the

Administrative Law Judge (ALJ).  In fact, under the statutory scheme of the

Social Security Act, the reviewing court "must uphold the factual findings of

the Secretary if they are supported by substantial evidence and were

reached through application of the correct legal standard." ***Craig v. Chater***, **76 F.3d 585, 589 (4th Cir. 1996); 42 U.S.C. § 405(g) (1988).** Substantial evidence is defined as that which "a reasonable mind might accept as adequate to support a conclusion." ***Id.*** "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." ***Id.***; ***Shively v. Heckler***, **739 F.2d 987, 989 (4th Cir. 1984).** If there is sufficient evidence to withstand a motion for a directed verdict had the case been before a jury, then the evidence is substantial and the ALJ's decision may not be overturned. ***Id.*** "It is not our place either to weigh the evidence or to substitute our judgment for that of the Secretary if that decision was supported by substantial evidence." ***Hunter v. Sullivan***, **993 F.2d 31, 34 (4th Cir. 1992) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).** Thus, the issue for resolution here "is not whether [Plaintiff] is disabled, but whether the ALJ's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." ***Craig, supra.***

Each party has moved for summary judgment, claiming they are entitled to judgment as a matter of law. Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving

party is warranted as a matter of law. **Fed. R. Civ. P. 56(c).** A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. ***Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).**

Where the parties have cross-moved for summary judgment, the Court will consider each motion separately. Thus, in considering the Plaintiff's motion, Plaintiff as the moving party has an initial burden to show a lack of evidence to support Defendant's case. ***Shaw, supra* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).** If this showing is made, the burden then shifts to the Defendant who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiff]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* After consideration of the Plaintiff's motion, the same procedure is used in connection with Defendant's motion for summary judgment.

Thus, in considering the facts of the case for purposes of these cross-motions, the Court will view the pleadings and material presented in

the light most favorable to the nonmoving party. **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, **475 U.S. 574 (1986).** Thus, in order to receive disability insurance benefits, Plaintiff must show that she was disabled on or prior to March 31, 2001, the date on which she last met the insured status under the Social Security Act. **Kasey v. Sullivan**, **3 F.3d 75, 77 n.3 (4th Cir. 1993); 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131;** **Wilkins v. Secretary**, **925 F.2d 769, 771 n.2 (4th Cir. 1991); Fagg v. Chater**, **106 F.3d 390 (table), 1997 WL 39146 *1 (4th Cir. 1997).** Moreover, the fact that a condition which had its onset prior to that date later rendered Plaintiff disabled is not sufficient to warrant an award of benefits. **Roberts v. Schweiker**, **667 F.2d 1143, 1144 (4th Cir. 1981).**

## II. PROCEDURAL HISTORY

The Plaintiff filed an initial application for disability insurance benefits on April 1, 1999; this claim was denied initially and upon reconsideration. **Plaintiff's Memorandum in Support of Motion for Summary Judgment, filed October 25, 2006, at 1.** She filed another application on January 17, 2001; this claim, too, was denied initially and upon reconsideration. **Id**. She timely filed a request for a hearing before an Administrative Law Judge

(ALJ) and such hearing was held on February 7, 2003. *Id.* **at 1-2.** The ALJ issued an unfavorable decision on June 26, 2003, and the Plaintiff requested Appeals Council review. *Id.* The Appeals Council rejected her request for review on August 2, 2004. *Id.* On September 23, 2004, the Plaintiff filed an action in this Court which resulted in a judgment and consent order remanding the case to the Commissioner for further proceedings. *Id.* The Appeals Council issued an order on February 9, 2005, "vacating the previous decision of the ALJ and finding certain deficiencies in the prior decision. This order gave specific instructions to the [ALJ] to hold another hearing and to properly evaluate the claim. Another hearing was held by [the ALJ] on April 28, 2005. The ALJ issued a second unfavorable hearing decision on October 24, 2005[.]" *Id.* **at 2 (citations omitted).** The Plaintiff requested Appeals Council review on December 19, 2005; the Appeals Council rejected her request on January 16, 2006. *Id.* She filed this action on January 26, 2006. Following the Defendant's answer on August 23, 2006, the parties filed their respective motions for summary judgment on October 25, 2006, and December 13, 2006.

### III.  FINDINGS OF FACT

Plaintiff testified at the hearing held April 28, 2005, that she last worked as a cashier in a grocery store and had to quit that job in April 1996 because of severe pain in her legs and that this pain became intolerable prior to March 31, 2001 (the date she last met insured status).  **Transcript of Proceedings, filed August 23, 2006, at 420-21.**  She further testified that her primary physicians were First Charlotte Group of Physicians which had been treating her from June 1997 through July 1999; Dr. Cole began her treatment in November 2000, and Dr. Dickerson began treating her on January 16, 2001.  **Id. at 425.**  She had been treated by an oncologist for ovarian cancer which was removed *via* surgery and had no recurrence; that her treatment by the First Charlotte physicians' group included the management of her diabetes, high blood pressure, high cholesterol and acid reflux; thereafter, she began seeing Dr. Cole who continued the proper management of those conditions.  **Id. at 425-26.**  She further testified that she has suffered from depression since she last worked and this has caused her to gain weight to the point that she weighed 390

pounds at the time of her hearing.[1]  *Id*. **at 426-27.**  The Plaintiff testified that she has suffered with leg and/or foot pain every day for the past four or five years; that she takes hydrocodone for the pain; and that the pain affects her ability to pay attention, to concentrate and to focus on things. *Id*. **at 427-29.**  The Plaintiff further testified that she had been diagnosed as suffering from neuropathy in her legs which causes them to "go to sleep," feel like "cement" and she is unable to lift them.  *Id*. **at 429-30.**  She further testified that the diabetes depletes her energy, but that her cholesterol, high blood pressure, and acid reflux are all controlled with medication.  *Id*. **at 431.**  She testified that her significant weight prevents her from lifting and carrying anything; that when she sits for any length of time she suffers numbness in her legs and that she has to change positions every 10 minutes or so; that she has problems standing and walking and cannot balance on her feet without the assistance of her cane; that the numbness and burning sensations she experiences in her feet affect her ability to walk; she cannot climb steps, stoop, bend, squat or crawl, and her husband has to tie her shoes for her.  *Id*. **at 432-34.**  In

---

[1] It was noted on the record of the hearing that the Plaintiff attended the hearing in a wheelchair with a cane.  **Tr. at 427.**

order to bathe, she uses a chair in the shower. *Id.* **at 435.** She does not

do any shopping or go out in public for fear of being laughed at; she does

not do any housework other than some cooking while sitting down. *Id.* **at**

**437-38.** The Plaintiff further testified that some days she takes as many as

three hydrocodone pills to manage her pain and she takes two pills daily to

manage her diabetes. *Id.* **at 439.** Her husband also testified at the

hearing and corroborated the Plaintiff's testimony. *Id.* **at 443-53.**

Plaintiff first saw Dr. Alicia W. Cole on November 6, 2000, at which

time she was diagnosed as suffering from diabetes (under good control),

hypothyroidism, hypertension (well controlled), morbid obesity,[2] tinea

corporis,[3] and contact dermatitis. *Id.* **at 333-34.** Plaintiff's medical records

covering the period November 2000 to July 2002 tend to confirm and

validate the seriousness of her physical limitations up to and including

March 31, 2001. *Id.* **at 332-53.**

---

[2] A diseased, unhealthy condition of weighing two or three times the
ideal weight, "so called because it is associated with many serious and life
threatening disorders," such as diabetes and hypertension. ***Dorland's
Illustrated Medical Dictionary* (28th ed.).**

[3] Ringworm. ***Dorland's, supra.***

Dr. Cole completed a disability assessment on August 28, 2002, in which she limited Plaintiff's ability to lift and carry a maximum weight of five pounds frequently/repetitively and 15 pounds occasionally only for a third of an 8-hour workday; she could sit only three to four hours during the workday and she would need to change positions frequently; she could only stand/walk one hour out of a workday because of difficulties with balance and gait; she was limited in her abilities to climb stairs/ladders, bend, stoop, squat,  push/pull, and in her ability to use her hands and feet to operate machine controls.  *Id*. **at 366.**  She also reported that the Plaintiff would suffer moderately severe to severe pain in her back and legs upon any significant activity.  *Id*. **at 367.**  It was also Dr. Cole's opinion that the Plaintiff's underlying medical conditions of neuropathy, obesity, and degenerative joint disease of the back and knees were consistent with the Plaintiff's complaints of pain and that such pain would likely interfere with a normal work pace for an 8-hour day/5 days per week, create interruptions of work and unpredictable periods for rest/breaks, and interfere with her ability to sustain concentration and work pace.  *Id*.  Dr. Cole further opined that the Plaintiff had been "compliant [with] med[ications] and office visits"

and that her "conditions are chronic and have been persistent since beginning of my care 11/00." *Id.*

The Plaintiff was first seen by Dr. Leon A. Dickerson, an orthopedic specialist, on referral by Dr. Cole on January 16, 2001. *Id*. **at 355.** On examination, Dr. Dickerson diagnosed the Plaintiff as suffering from degenerative arthritis of both knees "with patellar malalignment" and left leg numbness with possible peripheral neuropathy. *Id*. **at 356.** He provided her with "Mobic samples 7.5 mg" and a prescription for Tylenol-3 for severe pain and placed her on an aquatic exercise program. *Id*. Two months later on March 15, 2001, the Plaintiff's condition had not improved with the exercise regimen or medications and a mixture of Xylocaine and Kenalog was injected into both knees. *Id*. Beginning in June 2001 through August 7, 2001, the Plaintiff received three Synvisc injections into her knees which were "essentially of no help." *Id*. **at 356-58.** An EMG was performed which was positive for peripheral neuropathy, caused by the Plaintiff's diabetes, and degenerative arthritis of the knees. *Id*. **at 360.**

Dr. Dickerson also completed a disability assessment and described the Plaintiff as suffering from bilateral knee pain, severe arthritis and degenerative joint disease, and peripheral neuropathy. *Id*. **at 368.** He

further stated that these conditions would limit the Plaintiff's ability to carry a maximum of 20 pounds occasionally and 5 pounds frequently and that she could not carry any amount of weight on a repetitive basis; she was limited in her ability to sit only 4 hours during an 8-hour workday and she would be required to change positions every few minutes; that she could only stand/walk a maximum of one hour during an 8-hour workday and that her "extreme obesity would markedly interfere with her ability to main[tain] gait, station, standing and walking." *Id.* Any activity requiring the climbing of stairs/ladders, bending, stooping, squatting, pushing and pulling, and the use of her hands and feet to operate machine controls would be limited because such activities would aggravate her pain. *Id*. Dr. Dickerson further opined that the Plaintiff experienced severe pain in both her lower extremities that was documented by x-rays; that this degree of pain would interfere with the Plaintiff's ability to work at a normal pace for an 8-hour workday and would create interruptions in work and unpredictable periods of rest/breaks. *Id*. **at 369.** He also stated that this degree of pain suffered by the Plaintiff would interfere with her sustained concentration and work pace. *Id*. Dr. Dickerson further stated that it was his opinion that the

conditions she suffered had persisted before he began treating her and

that her "prognosis for return to work is guarded at best." *Id*.

Prior to the Plaintiff's second hearing before the ALJ in April 2005,

she was evaluated by C. David Tollison, Ph.D., Licensed Clinical

Psychologist, in regard to her complaint of intense depression. *Id*. **at 491.**

She was previously evaluated by Dr. Tollison in March 2003 and he found

that her depression had worsened since that time.

> The MMPI of March 6, 2003 is compared with MMPI
> administration of this date. Both test profiles are statistically
> valid. Furthermore, there is consistency in profile slope,
> configuration, and symptom constellation. This finding
> suggests the chronicity of her psychological symptoms as well
> as the lack of improvement in her psychological condition over
> time. . . . [The Plaintiff] continues suffering pain and in
> reviewing the medical record there does appear to be an
> organic basis for her pain. . . . [S]he has become clinically
> depressed. Her depression is noted to be chronic and neither
> her physical or psychological condition appear to be improving
> over time. Consequently, her prognosis is considered guarded
> to poor. She is expected to have particular difficulty completing
> tasks within timely limits and is expected to require an
> excessive number of rest periods and breaks throughout the
> day. Furthermore, her ability to maintain concentration over
> time is expected to be significantly impaired as a result of the
> combination of her physical and psychological symptoms.

*Id*. **at 492.** Dr. Tollison diagnosed the Plaintiff as suffering from "Affective

Disorder (dysthymic disorder) [and] Somatoform Pain Disorder (associated

with both psychological factors and a general medical condition)." *Id*.

A disability report completed by a claims representative in a district field office in March 1999 showed that it was apparent the Plaintiff "was in some type of physical distress during the interview as [the representative] heard [the Plaintiff] moan when she moved about." *Id*. **at 139.**

A series of medical reports and laboratory studies dated June 18, 1997, through July 1999, from Dr. Sheley Revis, a member of the First Charlotte Physicians group, catalog a variety of Plaintiff's medical problems. Of particular note are the continuing diagnoses of morbid obesity, hypertension, hypothyroid condition, and degenerative joint disease of the knees throughout this entire two-year period. *Id*. **at 170-213.**

The Plaintiff was referred to Dr. Mark S. Gelder, oncologist, by Dr. Revis for abnormal uterine bleeding and the discovery of a complex pelvic mass in October 1997. *Id*. **at 214.** Dr. Gelder performed a D&C[4] on the Plaintiff in March 1998; however, her chronic uterine bleeding continued. *Id*. **at 216-18.** He also discussed the importance of getting her involved with a rigid weight loss program in order to improve several of her medical

---

[4] Dilation of the cervix and the removal of growths or other material from the wall of the uterus. ***Dorland's, supra.***

problems exacerbated by her morbid obesity. *Id*. **at 219.** The mass was

subsequently surgically removed and a total abdominal hysterectomy was

also performed. *Id*. **at 227.** The tumor was determined to be a Stage II-c,

Grade II endometrioid ovarian carcinoma and the Plaintiff successfully

completed several treatments of chemotherapy over 24 weeks. ***Id.,* at 227-**

**30.**

A vocational expert was also present at the Plaintiff's hearing and

testified. *Id*. **at 254.** The ALJ asked the vocational expert the following

hypothetical question:

> [A]ssuming I find for a relevant 12-month period . . . the
> [Plaintiff's] exertional impairments would permit both sedentary
> and light work. But assume significant non-exertional
> restrictions so that within these categories, I would [need] to
> limit one to simple, routine, repetitive jobs rather than jobs
> requiring more skill[,] concentration or attention. Assume also I
> would require jobs permitting only or requiring only occasional
> rather than frequent or repetitive climbing, balancing, bending,
> or stooping, operating foot controls. Assume also I would find a
> degree of chronic pain severe enough even with appropriate
> medication as to rule out sustained skill concentration, limiting
> one to the unskilled or semiskilled jobs of a simple, routine,
> repetitive nature as I've indicated previously. And finally,
> insofar as an eight-hour day, I would require jobs where a
> sit/stand option, the ability to change positions at least once
> every hour, if not at will, would be permitted. If I were to place
> those non-exertional limitations on sedentary and light work for
> a female of 31 to 36 years of age with a high school education
> and the prior work to the extent it might be relevant, are there
> jobs such a person could do?

*Id*. **at 454-55.**  The vocational expert answered that there would be a number of cashiering functions such as those for parking facilities where a person could sit or stand and such position was classified as unskilled and sedentary.  *Id*. **at 455.**  Additionally, there were positions as food checkers in cafeterias where the work is principally sedentary and could be performed from wheelchairs or arm crutches, if necessary.  *Id*. **at 455-56.**  He further identified unskilled bench work such as assembly of electrical accessories or light fixtures or various electronic activities.  *Id*. **at 456.**  He further testified that all of these jobs existed in significant numbers within North Carolina and the national economy.  *Id*.

## IV.  DISCUSSION

The Court finds that the above hypothetical posed by the ALJ to the vocational expert is fatally defective in that there is no mention of the Plaintiff's morbid obesity and the significant limitations in her abilities to balance, stand, stoop, bend, and walk as identified by her treating physicians.  Nor does the hypothetical comply with the observations and requirements specifically dealing with morbid obesity as set forth in the policy interpretation ruling SSR 02-1P issued September 12, 2002.  This

ruling recognized obesity as "a complex, chronic disease." *See* **SSR 02-1P, 2000 WL 628049 (S.S.A.).** The ruling also recognized three levels of obesity and the manner in which the disease will be evaluated for determining disability or its effect on functional capacity. The ALJ's hypothetical limited chronic pain severity to "enough even with appropriate medication as to rule out sustained skill concentration." This simply ignores the evidence of her treating physicians and others that the severity of her pain would limit her ability to perform any sedentary or light activities at all.

Disability under the Social Security Act means the inability to engage in any substantial gainful activity due to a physical or mental impairment expected to result in death or to last for a continuous period of not less than twelve months. In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. *See,* **20 C.F.R. § 416.920.** If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. *Pass v. Chater*, **65 F.3d 1200, 1203 (4ᵗʰ Cir. 1995).**

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. *Id*. Second, the applicant must show

a severe impairment. If the applicant does not show any impairment or combination thereof which significantly limits the physical or mental ability to perform work activities, then no severe impairment is shown and the applicant is not disabled. *Id.* Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the applicant is disabled regardless of age, education or work experience. *Id.* Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. *Id.* Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. *Id.* In this case, the ALJ's determination was made at the fifth step. "Even if the claimant's non-exertional limitations do not allow her to perform the full range of 'sedentary' and 'light' work, . . . there are a significant number of jobs in the national economy which the claimant could perform." *Id.* **at 24.** The ALJ, therefore, found that the "claimant

[was] not entitled to a period of disability and to disability insurance benefits under Sections 261(I) and 223, respectively, of the Social Security Act." *Id*.

"The burden of proof and production rests on the claimatn during the first four steps, but shifts to the Commissioner on the fifth step." ***Burch v. Apfel*, 9 F. App'x 255, 257 (4ᵗʰ Cir. 2001) (citing *Pass v. Chater, supra*).** As noted, Plaintiff carried her burden of proof on the first four steps and the ALJ so found by proceeding to the fifth step where the burden then shifted to the Commissioner. "In questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." ***English v. Shalala*, 10 F.3d 1080, 1085 (4ᵗʰ Cir. 1993).** These questions must fairly set forth all of the claimant's impairments. ***Walker v. Bowen*, 889 F.2d 47, 50 (4ᵗʰ Cir. 1989).** It can hardly be claimed that a prospective employer would look with favor on a prospective employee whose height is 5'1" and weight fluctuates from 360 to 400 pounds. There are references in the record of advice to Plaintiff from her treatment physicians that she should lose weight. However, "absent evidence that claimant's weight was within her

control, claimant's failure to lose weight upon physicians' recommendations did not preclude claimant from receiving disability benefits." **Lucas v. Sullivan, 918 F.2d 1567, 1574 (11ᵗʰ Cir. 1990) (citing McCall v. Bowen, 846 F.2d 1317, 1319 (11ᵗʰ Cir. 1988)).**

The ALJ failed to fully credit the findings by Plaintiff's treating physicians contained in the record as to the knee pain caused by her extreme obesity as well as other exertional limitations despite the general rule that "courts typically 'accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.'" **Hines v. Barnhart, 453 F.3d 559, 563 (4ᵗʰ Cir. 2006) (quoting Johnson v. Barnhart, 434 F.3d 650, 654 (4ᵗʰ Cir. 2005)) (other citations omitted).**

The ALJ also failed to properly credit Plaintiff as suffering with severe debilitating pain "because a laundry list of objective indicators did not appear in [the treating physicians'] medical records." **Id.** He also discredited Plaintiff's own testimony concerning the severity and disabling nature of her pain she had suffered since the mid-1990's. In short, as observed in *Hines*, subjective evidence of pain must be properly evaluated.

"'[T]he adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.'" ***Id*. at 564 (quoting Social Security Ruling 90-1p).**

This Court concludes that the ALJ's findings are not supported by substantial evidence in that the crucial hypothetical question posed to the vocational expert failed to state properly the true physical and mental limitations Plaintiff suffered prior to March 31, 2001. Thus, the Commission failed in carrying "the burden of providing evidence of a significant number of jobs in the national economy that [the] claimant could perform." ***Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000)) (other citations omitted).**

For the foregoing reasons, the Commissioner's decision denying disability benefits to the Plaintiff is reversed and this matter will be remanded to the Commissioner for an award of benefits beginning on or before March 31, 2001.

## V.  ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motion for summary judgment is hereby **GRANTED** and the Defendant's motion for summary judgment is hereby **DENIED**.  A Judgment reversing the Commissioner's decision and awarding benefits to the Plaintiff is filed herewith.

Signed: February 2, 2007

Lacy H. Thornburg
United States District Judge